**J. M. MEDLIN, Appellant,**

v.

**OKLAHOMA MOTOR HOTEL CORPORATION, a corporation, et al., Appellees.**

**No. 47276.**

Court of Appeals of Oklahoma,
Division No. 2.

Oct. 28, 1975.

Released for Publication By Order of Court
of Appeals Nov. 20, 1975.

Robert P. Jordan, Oklahoma City, for appellant.

Charles W. Stubbs, Stubbs, Stiner & Pace, Oklahoma City, for appellees.

BRIGHTMIRE, Judge.

Plans for the construction of a Ramada Inn Motel on Interstate Highway 35 south of Oklahoma City, Oklahoma, fell through when adequate financing could not be obtained. In its wake the vanished dream left a dispute over two or three acres of land Bert K. Bloomfield and his wife deeded to a corporation the parties set up in 1963. It reached the courts when J. M. Medlin filed this lawsuit asking that a deed to the land executed by the Bloomfields to themselves on behalf of the corporation be cancelled, that the corporation be dissolved, and that the land be distributed to the stockholders as an asset either in kind or in cash equivalent. The trial court, following a hearing, dissolved the corporation, but declined to retrieve the land as a corporate asset. Instead title to it was quieted in the Bloomfields. Medlin, of course, appeals contending the court reversibly erred (1) in failing to cancel the corporate deed to the Bloomfields and (2) in treating this case as being controlled by a precorporation oral agreement and decreeing its rescission.

The factual background of this scenario began one midsummer day in 1962 when J. M. Medlin—a contractor, land developer, and promoter—came through Oklahoma City in route from Phoenix, Arizona to his home in Nashville, Tennessee. With him he brought his aunt, Mrs. Bloomfield's mother, who wanted to spend a few days with her daughter. Upon arriving in Oklahoma City, Medlin drove to a location

near the intersection of Interstate Highway 35 and Southeast 66th Street where the Bloomfields owned and operated a service station.

As Medlin remembered the early conversation, he told them he had gone to Phoenix to observe a Ramada Inn in operation as preliminary exploration of the possibility of building one in Nashville. This evidently piqued the Bloomfields' interest because they pointed out their two to three-acre tract across the highway and said, "Why not [build it] here?"

"Well," replied Medlin, "I don't know, it's a possibility."

Medlin soon decided the Bloomfield land would be a "wonderful site for a motel" and the possibility promptly ripened into an oral agreement which, according to Medlin, was that "[t]hey would put the land into the corporation and I would try to use my best efforts for what ever money that was needed to try to put it together."

The Bloomfield version varied but little. Referring to that summer visit he said: "We talked about a site for a motel and he saw my strip of land and he said that it would be a wonderful site for a motel. . . . Later that day he came back and I told him that I would like to see one put over there but I didn't have any money to put one over there."

"That's no object," said Medlin. "I'll furnish all the money up to the permanent loan, then you and I will sign a permanent loan on the Ramada Inn."

"That's agreed on," said Bloomfield.

Later Medlin testified that the "agreement was a one-half interest in the business. He was to transfer the land. I was to put my share up in money and he was to put the land up, and he was to own a half interest and I was to own a half interest [in the corporation]."

There was no agreement regarding Bloomfield's land at that time. "The land," explained Bloomfield, "wasn't put in the corporation until he came back up here, I don't know the exact date, he came back numerous times, and he said that he was working on the loan for the motel. . . . A couple of years later he called me one night and said that he was going to come up here and that we had to put this land in the corporation so that we would have some security to borrow money on. I told him all right and I put the land in the corporation so that the corporation could borrow money to build a motel. . . . He [Medlin] told me that if I would put the land in the corporation he would furnish all the money up to construction when it was completed and then we would sign a permanent loan. . . . [and] I would get the top money off the loan for his portion of the land."

The parties formed the Oklahoma Motor Hotel Corp. in 1963. Along with the articles of incorporation, there was filed with the Secretary of State of Oklahoma an affidavit wherein the Bloomfields swore that capital in the sum of $500 had been paid in. Medlin was elected president and director; Mrs. Bloomfield, vice president and director; her husband, secretary-treasurer and director. No stock was ever actually issued but "stockholders" meetings were held from time to time and a document executed by the parties November 12, 1965, recited that Medlin owned half and the Bloomfields owned the other half of the outstanding stock.[1]

Earlier, on March 19, 1965, the Bloomfields had executed a general warranty

1. The instrument entitled "Stock Purchase Agreement" reads in pertinent part:
"1. *Capital Structure.* Corporation does hereby represent and warrant that at the present time, its capital structure consists of an authorized capital of $100,000 shares of Voting Common Stock of $1.00 par value each, of which 500 shares are issued and outstanding as follows:

| | |
|---|---|
| Thelma L. Bloomfield | 125 shares |
| Bert K. Bloomfield | 125 shares |
| J. M. Medlin | 250 shares |

deed conveying their land to the corporation. The deed contained no restrictive language nor were any written notes or memoranda made specifying any conditions, limitations or restrictions on the corporate ownership.

In the meanwhile, Medlin had obtained an agreement from Ramada Inns, Inc., granting the parties a franchise. His search for adequate financing continued. Eventually he achieved loan commitments totaling about $600,000 (which he said was about $100,000 short) before giving up in 1967 by which time he had spent out of his own pocket more than $30,000.[2] This, Medlin said, was his contribution to the adventure for his one-half interest in the corporation, while the Bloomfields contributed their land for the other half.[3]

In 1967 the Bloomfields filed a lawsuit to "get Mr. Medlin here to dispose of the Oklahoma Motor Hotel Corporation." Medlin asked for more time to raise construction money, Bloomfield "agreed to give him another year," and dismissed the suit.

But if Medlin's loan-procuring efforts continued they were unproductive. Consequently, the Bloomfields sent a telegram to Nashville on December 4, 1970, at 12:59 p.m., advising Medlin that in their capacity as directors of the corporation they were calling a special meeting of the board of directors to be held at 921 Southeast 66th Street in Oklahoma City on December 7, 1970, at 1:30 p.m. "Said meeting," read the wire, "being called for the purpose of: Number 1—liquidation of any indebtedness of said corporation. Number 2—to dispose of assets and to transact any and all other business of the corporation." Medlin says he found this three-day notice under his door on the evening of December 6.

The minutes of this meeting appearing in the corporate record book recite that on December 7, 1970, at 1:30 p.m., the two directors met. Vice president Thelma Bloomfield presided. Her husband, acting

2. According to his testimony the following were among the nonrefundable expenses he incurred, all of which were supported by cancelled checks except the first item involving two checks which he said were lost and the bank's microfilm of them was destroyed in a flood:

| | | | |
|---|---|---|---|
| (a) | 1965. | Ramada Inns, Inc. (paid with two checks) for the franchise license | $ 7,500.00 |
| (b) | 9–17–63 | Stand-by fee | 500.00 |
| (c) | 10–8–63 | Corporate Charter and attorney's fees | 211.00 |
| (d) | 4–29–64 | Air fare to O.C. | 95.97 |
| (e) | 5–8–64 | Survey | 6.75 |
| (f) | 7–2–64 | Air fare to O.C. | 95.97 |
| (g) | 8–10–64 | Aerial photograph | 37.50 |
| (h) | 11–16–64 | Bradshaw Engineering | 257.50 |
| (i) | 11–23–64 | Mortgage Facilities Corp.—loan deposit | 1,000.00 |
| (j) | 12–14–64 | Pilot fee | 150.00 |
| (k) | 2–4–65 | Trans World Funding Corp.—loan deposit | 5,000.00 |
| (l) | 2–4–65 | Mortgage Funding Corp.—appraisal fee | 1,500.00 |
| (m) | 3–20–65 | Corporation tax and fees | 186.67 |
| (n) | 7–16–65 | National Life Insurance Company— loan commitment fee | 6,525.00 |
| (o) | 7–29–65 | Mortgage Facilities Corp.—balance on loan commitment fee | 1,900.00 |
| (p) | 7–29–65 | Attorney's fee for preparing commitment | 500.00 |
| (q) | 10–22–65 | Attorney's fees | 220.75 |
| | | Total | $25,687.11 |

3. There was no evidence of the land value except that the Bloomfields paid $20,000 for it in 1961, about a year before the motel proposal came up.

as secretary, recorded that "the following discussion was had:

"The Vice-President explained that prior to the 19th day of March, 1965, that the President advised the Board of Directors that he was sure that he could obtain a construction loan, in a sufficient amount to construct a motel on said premises, but that in order to obtain this loan it would be necessary that the Corp. have the legal title to certain property owned by Thelma L. Bloomfield and Bert K. Bloomfield; and further explained, that if for any reason he failed to obtain such a loan, in a reasonable period of time, that the Corp. would reconvey said property back to the grantors. That in accordance with said proposal and the assurance of the President, said property was conveyed to said Corp. for that purpose only.

"That after a period of seven (7) years time the President having wholly failed to obtain such a loan, in accordance with said agreement, the Board of Directors now feel that they should reconvey said property to its rightful owners."

The vice president was persuasive because the minutes disclose next that:

"On motion by the Secretary and seconded by the Vice-President and duly carried, the Vice-President and Secretary were directed by the Board of Directors to reconvey said property to the rightful owners."

Finally, after ordering themselves to file a "corrective" deed the two directors adjourned. No stockholders' meeting was called and none was held. On December 9, 1970, there was filed a record a warranty deed to subject property from the corporation to the Bloomfields signed by Thelma as vice president and attested by Bert as secretary. A few days later on December 16, 1970, a second deed from the Bloomfields to the corporation was filed reciting that its purpose "is to correct the legal de-

scription" contained in the March 19, 1965, deed.[4]

By and by Medlin found out about the December conveyance and on March 22, 1972, filed this action asking for dissolution of the corporation, establishment of each shareholder's proportionate interest, appointment of a receiver to wind up the affairs of the corporation and distribute its only asset—the land in question—to the stockholders.

The Bloomfields filed an answer denying Medlin owned one-half of the stock and that the corporation had any assets, but joined in the request for dissolution. They also filed a reconventional demand that title to the land be quieted in them.

Medlin then amended his petition to plead that the corporation was formed pursuant to an "agreement" whereby Medlin would furnish the time and expense of promoting the motel, and the Bloomfields would contribute their land to the enterprise; that he performed by spending over 1,000 hours and $30,000; and that the Bloomfields therefore wrongfully deeded the land to themselves on December 9, 1970—a transfer that was fraudulent as to him—and asked that the deed be cancelled.

Bloomfields' answer to this new charge was lengthy. First, they denied an agreement or contractual obligation was pleaded; or, if one was pleaded, they "specifically deny" any contract ever existed; or, if one did exist, it was unenforceable under the Statute of Frauds. Second, they denied Medlin spent money on behalf of either themselves or the corporation pursuant to any agreement. Third, they allege their conveyance of land to the corporation was without consideration because "it was for collateral uses only." Fourth, they allege the lawsuit filed by them in 1967 was dismissed in consideration of Medlin's promise that he would try for another year to raise adequate financing; and if he failed, they "could have the title quieted"

---

4. The effect of this deed could raise some interesting questions. However, for purposes of this opinion we will treat it as though it did not divest the Bloomfields of their title.

to the realty. Fifth, they state that no stock was ever issued.

Trial of the case to the court was held on November 27, 1973. At its conclusion the court entered this judgment:

"It is . . . decreed by the court that the oral agreement entered into in the summer of 1962 between the plaintiff and the defendants . . . is hereby rescinded, canceled, annulled and held for naught.

"It is further . . . decreed . . . that the Oklahoma Motor Hotel Corporation . . . is hereby dissolved, that title to the real property heretofore conveyed by said defendants is hereby restored to the name of Bert K. Bloomfield and Thelma Bloomfield, husband and wife, and the plaintiff, J. M. Medlin, is hereby declared to have no interest in such real property, same being:

[its description is set out]

"Dated this 28th day of January, 1974."

This judgment was based on certain findings of fact and conclusions of law filed along with the journal entry of judgment. Summarized, the court found that the parties entered into an oral agreement in the summer of 1962, "whereby the said defendants [Bloomfields] were to put up certain real property, mainly as collateral to secure financing, and the plaintiff was to exercise his efforts toward securing the necessary financing of a proposed motel. Towards this end these parties incorporated . . . September 30, 1963," to which corporation the Bloomfields deeded their land. While Medlin has expended time and money in trying to obtain adequate financing of the project, he "concedes that he has been unsuccessful."

Upon these "facts" the trial court reached the following legal conclusions: (1) the rights of the parties are controlled by their initial oral agreement, (2) consideration for deeding the land to the corporation was Medlin's promise to finance and construct an authorized Ramada Inn Motel using the land as collateral for a construction loan, (3) this consideration failed through the fault of Medlin in that during a period of several years he was unable to obtain the necessary financing and therefore never constructed the proposed motel, (4) this failure of consideration was sufficiently significant to destroy the contract and authorize its rescission.

Medlin's first proposition is a general one—that failure to cancel the December 9 deed by the Bloomfields as corporate officers to themselves individually was reversibly erroneous. His second proposition assails the legal conclusions of the trial court as wrong.

I

The first contention rests on the theory that the Bloomfields acted wrongfully and breached their fiduciary duties as directors in holding a board meeting without giving proper notice thereof to Medlin and in then following this up with an illegal conveyance of the corporation's only asset to themselves without the approval of the stockholders and without any consideration to the grantor—a conveyance which is fraudulent as to Medlin.

We agree the procedure followed by the Bloomfields in December 1970 was unlawful. However, as circumstances existed at time of trial, we think such illegality became immaterial insofar as determining and equitably protecting the rights of the parties were concerned. Neither the rights of Medlin nor of third parties were substantially offended by the procedure. Why? Because had the Bloomfields done things right, no one can doubt that the directors' meeting would have resulted in the same resolve, and a stockholders' meeting would have reached a stalemate requiring one of the parties to seek the very same relief they seek in this action. Form must yield to substance. The law will not require that which is useless. Equity having taken cognizance of the dispute will decree its end.

## II

Under these circumstances the whole case boils down to the basic question of what interest, if any, Medlin has in the subject real estate; and this, in turn, depends entirely on what the parties intended as manifested by their words and actions.

■ We are satisfied the parties engaged themselves in a "joint adventure" within the legal sense of that phrase. *Rockett v. Ford*, Okl., 326 P.2d 787 (1958). They entered into a special combination jointly seeking a profit from the projected establishment and operation of a Ramada Inn Motel. No formal partnership did they form nor, as we shall shortly note, did they begin their pursuit of profit 'neath the banner of a corporate designation.

In the beginning, what did the parties intend with regard to the nature and extent of the Bloomfields' land contribution? What little is recorded on the subject inspires no great conviction one way or the other. One thing is both sure and unfortunate—the "agreement" was oral. Its indefiniteness is perhaps best underlined by Medlin's equivocal answer when asked, "What was the agreement that you and Bert Bloomfield had at that time [1962]?"

"The agreement was that . . . they would put the land into the corporation and I would try to use my best efforts for what ever money that was needed to try to put it together."

Later the court asked the same witness if there was an agreement about the money he said he advanced.

"I was to do this," said Medlin, "They were to furnish the land. I was to do the balance of it."

"Did you have any agreement about what would happen in the event the motel did not get built?" continued the court.

"No, sir, other than the fact that it was a fifty-fifty deal down the road, win, lose or draw."

Still later cross-examination found Medlin testifying: "The agreement was a one-half interest in the business. He was to transfer the land. I was to put my share up in money and he was to put the land up, and he was to own a half interest and I was to own a half interest [in the corporation]." But the corporation notwithstanding, Medlin says the "only agreement" the parties ever operated under was the one "made in the beginning," which was to last "[u]ntil we got it together, there was no time limit on it." In 1967 when the Bloomfields were trying to get their property back it was agreed Medlin could try one more year to "put the deal together."

As vague as this evidence is we think one thing stands out boldly and that is that the Bloomfields transferred their land to the corporation to furnish (a) collateral for a construction loan and (b) land upon which a motel would be erected in consideration of a one-half interest therein. For this purpose the corporation became a vehicle for furthering the venture's goal which, among other things, included holding title to the realty in trust. This and nothing more.

## III

■ While this case is not free from decision-retarding difficulties,[5] we think the trial court reached a correct and equitable conclusion based on the general rules adopted a half century ago in *Hurst v. Champion*, 116 Okl. 228, 244 P. 419 (1925), namely, ". . . if a contract is entire and remains executory in whole, or in part, and one party fails to perform what it is his duty to do under the contract, and the other party is not in default, the latter may rescind the contract," and ". . . rescission or cancellation may properly be ordered where that which was undertaken to be performed in the future was so essential a part of the bargain that the failure of it must be considered as destroying or vitiating the entire consideration of the con-

5. For instance, there is no breach of contract, fraud or bad faith on the part of anyone involved allowing us to press into service several settled rules of contract law.

tract, or so indispensable a part of what the parties intended that the contract would not have been made with that condition omitted."

Here the Bloomfields offered their land for a one-half interest in a motel which Medlin agreed to "put together," that is, get financed (at his own expense) and built, in consideration of the other one-half interest in the hostelry venture. True, no time was set for Medlin's performance. That did not mean, however, he had forever. He had only a reasonable time under the relevant circumstances. And certainly between 1962 and December 9, 1970—the date on which the Bloomfields elected to rescind the agreement signified by the overt act of conveying the land back to themselves—a period of time elapsed which seems more than reasonable for Medlin to have accomplished his part of the "deal." He never did. Nor did he at trial lay claim to ever being able to perform. Ironic it is that in the meantime others built a Ramada Inn Motel a short distance from the plot planned for use by the parties here.

Medlin argues, though, that rescission is not available to his adversaries because: (1) they were not diligent and "waited many years" before bringing this action, and (2) they have not laid the required statutory predicate by restoring "plaintiff to his original position."

Of course the first point is paradoxical. It is inconsistent with Medlin's trial position that the agreement was still executory insofar as his performance was concerned. Were we to take the contention seriously the effect would be to impale the Bloomfields on the prongs of a dilemma. If they sue early (as they did incidentally in 1967), Medlin can say (which he did) that he has not had time enough to perform. If they sue later, then Medlin decries the delay as dilatoriness. We hold Bloomfields' rescissionary act in December 1970 was timely under the circumstances—particularly in view of Medlin's failure to evince resulting detriment.

■ The second point also lacks merit because the Bloomfields received no restorable benefit or thing of value as contemplated by 15 O.S.1971 § 235. This means we disagree with Medlin's contention based on a syllabus in the early case of *Edwards v. Miller,* 102 Okl. 189, 228 P. 1105 (1924) that rescission in this case requires Medlin to be placed "in status quo" by granting him a judgment for $30,000 against the Bloomfields. While *Edwards* does not mention or purport to be construing § 235, the facts and related holding disclose the result to be in harmony with a host of other cases like, for instance, *Jones v. Goldberger,* Okl., 323 P.2d 344 (1958) holding the rescinder under § 235 is not required to restore the other party to complete status quo but only to return that which is of value which he has received. To foreclose the absurd the court in *Edwards* explained, with regard to the subject of rescission and restoration, that the phrase " 'in statu quo' does not necessarily mean that the other party shall be replaced in every sense." Certainly, for example, one cannot turn the clock back; replace a shock of grey hair; return the wasted time, effort, and worry which might be expected from seven or eight years of disappointing failure of promoter Medlin. Judicial termination of the agreement in this case is at the behest of faultless parties who not only fully performed their part of the agreement but to date have received naught but a lawsuit.

Appellees' motion to assess a reasonable attorney's fee is denied and costs of this appeal are taxed against appellant.

The decree appealed from is affirmed.

NEPTUNE, P. J., concurs.

BACON, J., not participating.